IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

WYOUMAN DAVID CAMP                                                                  PETITIONER

VS.                        CASE NO. 5:16CV00046 DPM/PSH

WENDY KELLEY, Director of the
Arkansas Department of Correction                                                   RESPONDENT

**PROPOSED FINDINGS AND RECOMMENDATION**

**INSTRUCTIONS**

The following recommended disposition has been sent to United States District Court Judge D. P. Marshall Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

**DISPOSITION**

Petitioner Wyouman David Camp ("Camp") seeks a writ of habeas corpus pursuant to 28 U.S.C. §2254. He is currently in the custody of the Arkansas Department of Correction (ADC) following a 2009 jury trial in the Circuit Court of Howard County in which he was convicted of murder in the first degree. The murder victim was Camp's wife, and the testimony at trial established that Camp hired Harry Surber ("Surber") to kill her. Camp was sentenced to life imprisonment. On direct appeal, Camp advanced two claims for relief: (1) the testimony given by accomplices was not sufficiently corroborated as mandated by Arkansas law; and (2) the trial court erred in allowing testimony that Camp attempted to hire a fellow inmate to kill his sister, who was one of his accomplices. The direct appeal to the Supreme Court of Arkansas was unsuccessful.

*Camp v. State*, 2011 Ark. 155.

In July 2011, Camp filed a state Rule 37 petition for postconviction relief, alleging eight claims for relief. Docket entry 10-8, pages 4-13. One of those claims was ineffective assistance of counsel in connection with Camp's rejection of a plea bargain. The circuit court conducted a hearing in March 2013, at which Camp was represented by counsel. Docket entry 10-8, pages 107-177. The trial court denied postconviction relief in November 2013. Docket entry 10-8, pages 94-104. The Supreme Court of Arkansas affirmed the trial court in March 2015.

In another action, filed while Camp's Rule 37 petition was pending before the trial court, Camp requested that the Supreme Court of Arkansas reinvest jurisdiction in the trial court to consider a petition for writ of error coram nobis. Docket entry 10-12. Camp alleged *Brady* and *Giglio* violations related to testimony about a deal struck between accomplice Surber and the prosecution. At trial, Surber testified that he told law enforcement he would give them information about the murder if the prosecution would not seek the death penalty against him. He further testified he was told the prosecutor could make no promises, but would do everything he could in this regard. Camp argued that Surber's testimony misled the jury into believing Surber would receive a sentence of life imprisonment when, in fact, Surber received a 40 year term of imprisonment when he later was sentenced. Camp argued that the alleged false representation "artificially enhanced the credibility of Surber's testimony." *Id.*, page 1. The Supreme Court of Arkansas denied Camp's request, specifically finding that even if Surber had a deal with the prosecution other than what he described at trial, Camp failed to demonstrate a reasonable probability that the result of the trial would have been different had that deal been disclosed at trial. *Camp v. State*, 2012 Ark. 226.

Camp, in his federal habeas corpus petition, claims:

(1) the Arkansas courts erred in refusing to vacate and reduce his sentence due to Camp's rejection of the plea offer resulting from ineffective assistance of counsel; and

(2) the Arkansas courts erred by refusing to vacate Camp's conviction and by refusing to

permit him to pursue a writ of error coram nobis, despite clear evidence of a *Brady* and *Giglio* violation in the misrepresentation of Surber's deal with the prosecution.

Camp acknowledges that both claims were advanced in state court and decided adversely to him. Claim 1 was pursued in his Rule 37 proceedings, and claim 2 was advanced in his petition to reinvest jurisdiction in the trial court to consider a petition for writ of error coram nobis.

When the state court has ruled on the merits of a petitioner's claims, a writ of habeas corpus may not be granted unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court." 28 U.S.C. § 2254(d)(1), (2). The United States Supreme Court offers guidance in interpreting the statute:

> A state court decision will be "contrary to" our clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in our cases," or "confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." A state court decision will be an "unreasonable application of" our clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case."
> . . . Distinguishing between an unreasonable and an incorrect application of federal law, we clarified that even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable.

*Penry v. Johnson*, 532 U.S. 782, 792-93 (citations omitted).

**Camp's First Claim:** Camp contends his first claim is meritorious because the state courts unreasonably applied *Strickland v. Washington*, 466 U.S. 688 (1984), and other Supreme Court cases concerning ineffective assistance of counsel. *Strickland* and the other cited cases are unquestionably "clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). It is clear that effective counsel encompasses the performance of attorneys in plea negotiations and decisions. *See, e.g., Hill v. Lockhart*, 474 U.S. 52 (1985).

An evidentiary hearing was conducted in the Rule 37 proceeding. Camp testified, but no testimony could be given by his trial attorney, who died shortly after the trial. The trial court denied

relief, and the Supreme Court of Arkansas affirmed, as follows:

> On May 26, 2008, Harry Surber fatally shot Camp's estranged wife, Robin Camp, while she worked as a cashier at the Family Dollar Store in Nashville. Prior to trial, the State offered Camp a sentence of twenty years in exchange for a guilty plea, but Camp rejected the State's offer. The case proceeded to trial, and Surber testified that Camp and his sister, Jo Ann Hicks, had hired him to murder Robin. The jury convicted Camp of first-degree murder as an accomplice and sentenced him to life imprisonment in the Arkansas Department of Correction. Paul Hoover, who is now deceased, represented Camp at trial. . .
>
> On March 4, 2013, the circuit court held a hearing on Camp's petition for postconviction relief. Camp testified about the circumstances surrounding the plea offer. He testified that Hoover was deceased; that Hoover had visited him twice in jail while he awaited trial; and that he had met with Hoover once or twice in the courtroom. Camp testified that he and Hoover discussed the State's offer of a twenty-year sentence in exchange for a guilty plea. According to Camp, Hoover advised him not to take the offer because the State did not have any evidence against him. The transcript of the parties' in-chambers plea discussion reveals that the circuit court directed Hoover to ask Camp pertinent questions surrounding the plea. In response to Hoover's questions, Camp stated that he knew that he could plead guilty in exchange for a twenty-year sentence; that he had knowledge of the plea offer but declined the State's offer; that he knew of the evidence to be presented; and that he made the decision to reject the plea offer voluntarily.
>
> At the Rule 37 hearing, Camp testified that he remembered declining the plea offer but claimed that he was not aware that the State would use certain evidence against him. When asked by Rule 37 counsel whether he had knowledge of the State's evidence presented against him at trial, Camp replied, "No." Camp claimed that he did not know that Hicks or Brandy Holt, his wife's daughter, would testify against him at trial. Camp stated that he was surprised when Hicks testified about "what [he] wanted done" and that Holt testified about a "pistol that was presented as evidence that I had her over at the sale barn taking target practice with it [sic]." Camp also claimed that Hoover had not told him prior to trial that Surber would testify that Camp had hired him to kill his wife. When asked if he would have accepted the twenty-year plea offer if he had been made aware of all the testimony, Camp responded, "Yes, sir, I would've." Counsel then asked if Camp declined the plea offer because Hoover had not advised him of the State's evidence used against him at trial. Camp replied, "That's right, sir."
>
> On November 6, 2013, the circuit court entered an order denying Camp's petition for postconviction relief. Specifically, with regard to the plea offer, the court found that Camp's testimony contradicted his allegations in his petition; that his arguments were based on self-serving statements; that his argument that Hoover should have had an ex parte in camera hearing concerning Camp's "inability to face reality [was] unreasonable and based on hindsight"; and that Camp's request to reduce his sentence was not based on any proven facts. The circuit court also denied postconviction relief on seven other grounds alleged in his Rule 37 petition. Camp timely filed his notice of appeal.
>
> For his sole point on appeal, Camp contends that the circuit court erred in denying his petition for postconviction relief because trial counsel was ineffective for

failing to inform him "of the severity of the evidence against him and the consequent failure to advise [him] to take the plea offer of twenty years." The State responds that the circuit court did not err by rejecting Camp's testimony about the circumstances of the plea offer, particularly in light of the evidence of Camp's conspiracy with Surber and Hicks, "his purported willingness to enter a plea acknowledging [the conspiracy]," and the evidence that, after he was arrested, Camp attempted to hire someone to kill Hicks.

This Court does not reverse the denial of postconviction relief unless the circuit court's findings are clearly erroneous. *Montgomery v. State*, 2011 Ark. 462, 385 S.W.3d 189. A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Id.* In making a determination on a claim of ineffective assistance of counsel, this court considers the totality of the evidence. *Id.*

We assess the effectiveness of counsel under the two-prong standard set forth by the Supreme Court of the United States in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See Sales v. State,* 2014 Ark. 384, 441 S.W.3d 883. In asserting ineffective assistance of counsel under *Strickland,* the petitioner first must demonstrate that counsel's performance was deficient. *See id.* This requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment. *See id.* The reviewing court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See id.* The defendant claiming ineffective assistance of counsel has the burden of overcoming that presumption by identifying the acts and omissions of counsel which, when viewed from counsel's perspective at the time of trial, could not have been the result of reasonable professional judgment. *See id.*

Second, the petitioner must show that the deficient performance prejudiced the defense, which requires a demonstration that counsel's errors were so serious as to deprive the petitioner a fair trial. *See Anderson v. State*, 2011 Ark. 488, 385 S.W.3d 783. This requires the petitioner to show that there is a reasonable probability that the fact-finder's decision would have been different absent counsel's errors. *See id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *See id.*

In the present case, Camp fails to prove his ineffective-assistance claim that he would have accepted the State's plea offer had Hoover disclosed the evidence against him. Here, the record reveals that Camp presented conflicting testimony prior to trial and at the Rule 37 hearing. In chambers prior to trial, when questioned by Hoover, Camp acknowledged that the State offered him a twenty-year sentence in exchange for his plea of guilty; that he wished to decline the plea offer; and that he made the decision "freely and voluntarily knowing basically what's coming in terms of testimony." However, at the Rule 37 hearing, Camp changed his testimony by asserting that if Hoover had adequately discussed the evidence presented at trial, he would have accepted the twenty-year plea offer.

We are mindful that the trier of fact is free to believe all or part of any witness's testimony. *Heard v. State*, 2012 Ark. 67, 2012 WL 503884 (per curiam). Conflicts in testimony are for the fact-finder to resolve, and the court is not

> required to believe the testimony of any witness, especially that of the accused, since he or she is the person most interested in the outcome of the proceedings. *Id.* Given this precedent, we agree with the circuit court's finding that Camp's "argument is based upon self-serving statements" in an effort now to prove his ineffective-assistance claim. While Camp claims that he "was operating under a clear misimpression of the strength of evidence arrayed against him," he failed to prove any deficiency on Hoover's part.
>
> We note that "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Anderson*, 2011 Ark. 488, at 4–5, 385 S.W.3d at 787 (quoting *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052). Because Camp did not meet his burden of proof on the deficiency prong of the *Strickland* test, we hold that the circuit court did not clearly err in denying the Rule 37 petition. Accordingly, we affirm the circuit court's denial of postconviction relief.

*Camp v. State*, 2015 Ark. 90, 1–2 (Ark., 2015).

Camp bears the burden of showing the foregoing decision of the Supreme Court of Arkansas unreasonably applied *Strickland* and other United States Supreme Court decisions. To show this, Camp must overcome a deference and latitude which must be granted to the state court's decision. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664). Given the credibility determination of the state trial court, there is nothing unreasonable about the Supreme Court of Arkansas' finding that Camp failed to satisfy the first prong of the *Strickland* analysis. Our careful review of the trial transcript supports the state courts findings. The state courts found Camp's statements were self-serving and therefore not credible when he expressed surprise at the evidence which was introduced against him. Camp's assertion that he did not know that his sister would testify against him and that Surber's testimony was a surprise are also not credible based upon the transcript. Camp's sister, Jo Ann Hicks, and Surber were already charged as part of the murder-for-hire scheme. Camp was aware of this, and their testimony was previewed during *voir dire*. Docket entry no. 10-2, pages 243-244. It was only moments after *voir dire* concluded when Camp declined the plea offer, explaining he freely chose to go to trial after consulting with his attorney. Docket entry no. 10-2,

6

pages 271-272. In sum, the decision of the state courts was not an unreasonable application of clearly established Federal law, as determined by the United States Supreme Court. There is no merit to the first claim of Camp.

**Camp's Second Claim:** Camp next argues error by the Arkansas courts in refusing to vacate his conviction despite clear evidence of a *Brady* and *Giglio* violation in misrepresenting the prosecution's deal with Surber. Camp contends "[i]naccurate information about a plea agreement, particularly involving a crucial witness, is a violation of *Brady*, particularly its *Giglio* progeny." Petition, page 11. This contention was addressed by the Supreme Court of Arkansas, when Camp sought to reinvest the trial court with jurisdiction to consider a petition for writ of error coram nobis:

> Petitioner sets forth a single claim as a basis for the writ. Petitioner presents the claim as one providing substantial evidence of a violation of the requirements of *Brady v. Maryland,* 373 U.S. 83 (1963). The claim concerns a deal struck between petitioner's accomplice, Harry Surber, and the prosecution.
>
> Surber admitted to killing petitioner's wife, Robin Camp. Surber testified at petitioner's trial that Surber was introduced to petitioner by petitioner's sister, Jo Ann Hicks; that petitioner had hired him at this first meeting to shoot Robin; that petitioner originally planned to only have Surber cripple Robin with shots to the legs or back, but that, when Robin left him, petitioner had changed the plans to have Surber murder her; and that—with help from Hicks and petitioner—Surber carried out those plans to murder Robin. According to Surber's testimony, petitioner had negotiated a price for each of the two plans, had made payments to Surber, had furnished a gun to Surber, had shown Surber Robin's car, had helped Surber and Hicks locate Robin's new apartment, and had given specific directions for carrying out both a failed attempt to shoot Robin at her home and the ultimately successful attempt to murder Robin at the store where she worked.
>
> In Surber's testimony at trial, he indicated that, after his arrest for the murder, he was at first determined that he would stick with the plans and that he would bear the consequences alone; that is, as he put it, that he would have "rode my own heat." Later, his sister convinced him to "just do the right thing, tell the truth." After that, Surber cooperated with the police. Surber told the police that he would give them information if they would not seek the death penalty. Surber testified that he was told that the prosecutor could make no promises, but that the prosecutor would do everything that he could in that regard.
>
> Petitioner's stated basis for the writ is that there was a significant discrepancy concerning this deal between the prosecution and Surber, as it was presented to the jury, and the sentence that was actually imposed upon Surber for the murder. Petitioner contends that the jury would have been misled into believing that

7

Surber would receive a life sentence for the crime. Petitioner has attached to his petition a copy of a judgment showing a term of years for Surber's conviction on first-degree murder. Petitioner asserts that the alleged false representation that Surber would receive a life sentence artificially enhanced the credibility of Surber's testimony. He desires a hearing to determine whether there was an undisclosed contingency agreement for reduction of the sentence depending upon Surber's testimony at trial.

The remedy in a proceeding for a writ of error coram nobis is exceedingly narrow and appropriate only when an issue was not addressed or could not have been addressed at trial because it was somehow hidden or unknown and would have prevented the rendition of the judgment had it been known to the trial court. *Burks v. State,* 2011 Ark. 173 (per curiam). To warrant a writ of error coram nobis, a petitioner has the burden of bringing forth some fact, extrinsic to the record, that was not known at the time of trial. *Martin v. State,* 2012 Ark. 44 (per curiam). A writ of error coram nobis is an extraordinarily rare remedy, more known for its denial than its approval. *Loggins v. State,* 2012 Ark. 97 (per curiam). This court has previously recognized that a writ of error coram nobis was available to address errors found in only four categories: insanity at the time of trial, a coerced guilty plea, material evidence withheld by the prosecutor, or a third-party confession to the crime during the time between conviction and appeal. *Webb v. State,* 2009 Ark. 550 (per curiam).

It is a petitioner's burden to show that the writ is warranted. *Scott v. State,* 2009 Ark. 437 (per curiam). This court will grant permission for a petitioner to proceed with a petition for writ of error coram nobis only when it appears that the proposed attack on the judgment is meritorious. *Hogue v. State,* 2011 Ark. 496 (per curiam). We are not required to accept the allegations in a petition for writ of error coram nobis at face value. *Goff v. State,* 2012 Ark. 68, ___ S.W.3d ___ (per curiam). The evidence presented at trial stressed that there were no promises made in return for Surber's testimony and did not in any way appear to indicate that a particular sentence had been promised to Surber. Even assuming the existence of a different deal with the prosecution, however, petitioner's claim does not warrant relief.

Allegations of a *Brady* violation fall within one of the four categories of error that this court has recognized. *Hogue,* 2011 Ark. 496. The fact that a petitioner alleges a *Brady* violation alone is not sufficient to provide a basis for error coram nobis relief. *Id.* Assuming that the alleged withheld evidence meets the requirements of a *Brady* violation and is both material and prejudicial, in order to justify issuance of the writ, the withheld material evidence must also be such as to have prevented rendition of the judgment had it been known at the time of trial. *Id.* To merit relief, a petitioner must demonstrate that there is a reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the information been disclosed at trial. *Id.* Petitioner does not make that demonstration.

Surber's testimony, as petitioner contends, was pivotal in this case. A successful attack on Surber's credibility may have significantly influenced the jury. Highlighting a deal struck with the prosecution for a term of years on sentencing, however, would not appear to be an attack that could have been successful. Even if, as petitioner alleges, the jury had been misled concerning the prosecution's deal

8

> with Surber, having the accurate information concerning the deal was unlikely to have significantly altered the jury's assessment of Surber's credibility.
>
> Surber's testimony was detailed and remarkably consistent with the events as described in the testimony that Hicks provided. So much so that the defense commented on whether such detail and consistency was not rehearsed. The police located, from two different locations, physical evidence presented at trial from information that Surber had provided. There was corroborating evidence that included phone records that validated calls between the accomplices, a call to a local business concerning the hours of operation, and the accomplices' movements, both to discuss the plan as it evolved and to carry it out. Other witnesses confirmed the victim's fear of her husband, and one of those witnesses confirmed that she had provided an address for the victim consistent with Surber's story. Video surveillance footage showed cars that, on the morning of the murder, passed the store where Robin was shot, and that footage was also consistent with Surber's testimony of what occurred. Other witnesses confirmed that the older, pearl-handled gun that Surber identified as the murder weapon had been in petitioner's possession prior to the murder and that petitioner's brother had at one time carried a similar weapon as the sheriff.
>
> This extensive corroborating evidence presented at trial lent a great deal of credibility to Surber's testimony, and a change in the actual sentence that Surber was to receive is unlikely to have changed the jury's assessment. Petitioner's claim that the deal was for a term of years does not raise a reasonable probability that the judgment of conviction would not have been rendered if the alleged undisclosed information had been available.
>
> During cross-examination, defense counsel questioned Surber concerning the deal that Surber indicated had been struck. Counsel's questions implied that Surber had changed his story to implicate petitioner so that Surber could get the prosecution to take the death penalty off the table, and counsel asked if Surber knew of any bigger incentive to change his story than that. The point is a valid one. Surber acknowledged a very great incentive in the prosecutor's offer to do what he could to avoid seeking the death penalty. While a deal to further reduce the sentence to a term of years might have been a bigger bonus, it does not appear that offer could have provided any better incentive than the one that had been acknowledged.
>
> Petitioner provided no facts to support a claim that there was any deal crafted to specifically implicate petitioner. Indeed, he expresses a desire for a hearing in order to investigate the possibility of raising that claim. The more general claim that he offers facts to support—that Surber may have been promised a term of years in order to cooperate—is not one that concerns material that would have impeached Surber further. Petitioner has failed to meet his burden to set forth a meritorious proposed attack on the judgment as a basis for issuance of the writ. Accordingly, we deny the petition to reinvest jurisdiction in the trial court.

*Camp v. State*, 2012 Ark. 226, at 1–3 (Ark.,2012).

As with the first claim of Camp's, there is no dispute that *Brady* and *Giglio* are clearly

established federal law. The question is whether the state court unreasonably applied the applicable federal law. Having reviewed the trial record and the state court ruling, Camp falls far short of demonstrating the state court unreasonably applied the law. To the contrary, the Supreme Court of Arkansas' decision ably recites the facts and reaches an appropriate conclusion. The trial transcript contains numerous references to Surber's decision to testify after the prosecution agreed to do whatever it could to waive the death penalty. This was referenced during *voir dire*, during opening statements,[1] during trial by witnesses Hayes McWhirter, Surber, Iris Lovewell, and Larry Marion, and during closing arguments. (Docket entry no. 10-2, pages 244, 285, 363, 407, 495-6, 541, and 546, and Docket entry no. 10-3, pages 233, 240, and 418). The Supreme Court of Arkansas reasonably found no showing by Camp that Surber had reached a more specific plea bargain at the time of Camp's trial, in April 2009.[2] The Supreme Court of Arkansas also reasonably found that Camp did not show the trial would have ended differently even had the jury been told Surber was to receive a lesser sentence than life in prison.[3] There is no merit to the second claim advanced by Camp.

**Conclusion:** Both claims of Camp are without merit, as he fails to demonstrate the state courts unreasonably applied federal law in ruling against him. As a result, we recommend the petition for writ of habeas corpus be dismissed and the relief requested be denied.

Pursuant to 28 U.S.C. § 2253 and Rule 11 of the Rules Governing Section 2554 Cases in

---

[1] In his opening statement, Camp's attorney stated, "We expect to prove that Ms. Hicks expects to get almost nothing and Mr. Surber, despite his, let's say sketchy past, has decided he'd rather take a little time than maybe be executed." Docket entry no. 10-2, page 185.

[2] Surber's subsequent plea to a 40 year sentence was entered in July 2009.

[3] At trial, Camp's other co-conspirator, his sister Jo Ann Hicks, also testified against him. Like Surber, she had not negotiated a specific plea deal at that time. She stated she had been promised "nothing" to testify but hoped for leniency. Docket entry no. 10-3, page 113. On cross examination, Jo Ann Hicks denied she had been promised a two year sentence in exchange for her testimony. Docket entry no. 10-3, pages 181, 190. The jury could have viewed Surber and Jo Ann Hicks as being similarly situated, both having pending plea agreements at the time of Camp's trial.

the United States District Court, the Court must determine whether to issue a certificate of appealability in the final order. In § 2254 cases, a certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(1)-(2). The Court finds no issue on which petitioner has made a substantial showing of a denial of a constitutional right. Thus, we recommend the certificate of appealability be denied.

    IT IS SO ORDERED this 19th day of January, 2017.

                                                                                                              UNITED STATES MAGISTRATE JUDGE